DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, John Skorvanek ("Skorvanek"), appeals from the decision of the Lorain County Court of Common Pleas. This Court affirms.
 I. {¶ 2} On September 30, 2006 and on October 3, 2006, the Lorain Police Department conducted controlled drug buys. The controlled drug buys involved the use of a confidential informant who attempted to buy drugs while police closely monitored the scene. During the September 30, 2006 controlled buy, police observed Skorvanek sell narcotics to the confidential informant in a parking lot of Biggy's Bar. Similarly, on October 3, 2006, police observed Skorvanek sell narcotics to the confidential informant on a sailboat at the Marina International Boat Docks in Lorain, Ohio.
 {¶ 3} Due to the observance of the controlled buys, police sought, and were granted, a search warrant of the sailboat. On October 4, 2006, police executed the search warrant. As a *Page 2 
result of the search, on October 5, 2006, police sought and executed a search warrant on two storage units that belonged to Skorvanek.
 {¶ 4} On November 21, 2006, Skorvanek was indicted on several drug charges. These charges included: three counts of trafficking in heroin, in violation of R.C. 2925.03, one count of possessing criminal tools, in violation or R.C. 2923.24, one count of possession of heroin in violation of R.C. 2925.11, and one count of possession of drug paraphernalia, in violation of R.C. 2925.14.
 {¶ 5} The matter proceeded to a jury trial on June 25, 2007 and on June 28, 2007, the jury found Skorvanek guilty on all six charges. On July 19, 2007, the trial court sentenced Skorvanek to 44 months of incarceration. Skorvanek timely appealed from his convictions and sentence and has asserted four assignments of error for our review. We have combined his first two assignments of error for ease of review.
 II. ASSIGNMENT OF ERROR I "THE GUILTY VERDICTS ON COUNTS ONE, TWO, THREE, FOUR, FIVE AND SIX WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED IN DENYING [SKORVANEK'S] MOTION FOR JUDGMENT OF ACQUITTAL, PURSUANT TO CRIMINAL RULE 29, ON COUNTS ONE, TWO, THREE, FOUR, FIVE AND SIX SINCE THEY WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE."
 {¶ 6} In his first two assignments of error, Skorvanek contends that his convictions were based on insufficient evidence and were against the manifest weight of the evidence. We do not agree. *Page 3 
 {¶ 7} Crim. R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." A trial court may not grant an acquittal by authority of Crim. R. 29(A) if the record demonstrates "that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." State v. Wolfe (1988), 51 Ohio App.3d 215, 216. In making this determination, all evidence must be construed in a light most favorable to the prosecution. Id.
 {¶ 8} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1, citing State v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring). Further
 "[b]ecause sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency. Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Emphasis omitted.) State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2.
 {¶ 9} Therefore, we will address Skorvanek's claim that his convictions were against the manifest weight of the evidence first, as it is dispositive of his claim of insufficiency.
 {¶ 10} A determination of whether a conviction is against the manifest weight of the evidence does not permit this Court to view the evidence in the light most favorable to the State to determine whether the State has met its burden of persuasion. State v. Love, 9th Dist. No. 21654,2004-Ohio-1422, at ¶ 11. Rather,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be *Page 4 
reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 11} This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 12} In the instant case, Skorvanek was convicted of three counts of trafficking in heroin, in violation of R.C. 2925.03(A). Pursuant to R.C. 2925.03(A), "[n]o person shall knowingly * * * [s]ell or offer to sell a controlled substance[.]" Pursuant to R.C. 2925.03(C)(6), "[i]f the drug involved in the violation is heroin or a compound, mixture, preparation, or substance containing heroin, whoever violates division (A) of this section is guilty of trafficking in heroin." Skorvanek was also convicted of one count of possession of heroin in violation of R.C. 2925.11. Pursuant to R.C. 2925.11(A), "[n]o person shall knowingly obtain, possess, or use a controlled substance[.]"
 {¶ 13} He was further convicted of one count of possessing criminal tools, in violation or R.C. 2923.24. Pursuant to R.C. 2923.24(A), "[n]o person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally." Further, "[i]f the circumstances indicate that the substance, device, instrument, or article involved in the offense was intended for use in the commission of a felony, possessing criminal tools is a felony of the fifth degree." R.C. 2923.24(C). Finally, Skorvanek was convicted of one count of possession of drug paraphernalia, in violation of R.C. 2925.14. Pursuant to R.C. 2925.14(C)(1), "[n]o person shall knowingly use, or possess with purpose to use, drug paraphernalia." Drug paraphernalia is defined as
 "any equipment, product, or material of any kind that is used by the offender, intended by the offender for use, or designed for use, in propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing *Page 5 
into the human body, a controlled substance in violation of this chapter." R.C. 2925.14(A).
 {¶ 14} The State called Lorain Police Department Narcotics Detective Andrew Mathewson. Mathewson explained that a controlled buy is an arrangement between a narcotics detective and a confidential informant. A confidential informant is an undercover civilian. Through information from the confidential informant and through the detectives' own investigations, detectives identify individuals from which they believe they can purchase illegal drugs. After a target is established, detectives meet with the confidential informant, search him for contraband and money, and provide him with previously marked money, otherwise known as "buy money." The confidential informant is wired so that detectives can monitor the impending drug buy. The confidential informant will then proceed to purchase drugs from the target. After the drug buy, the confidential informant immediately meets with detectives who search him and confiscate any illegal drugs he has purchased.
 {¶ 15} Mathewson testified that on September 30, 2006, he observed a drug buy involving Skorvanek. He identified Skorvanek in court. Mathewson testified that he was an assisting detective on that day and that he conducted surveillance and took surveillance photos. He testified that as part of his duties, he was to keep the confidential informant under surveillance. He testified that on September 30, 2006, a drug transaction took place in the parking lot of Biggy's Bar, located in Lorain County, Ohio. He testified that from his vantage point he was able to observe the transaction. Mathewson testified to photos that he had taken of the scene, which were published to the jury. The first photo portrayed a van that had been previously targeted as one Skorvanek may have been driving. Mathewson further testified to a photo of Skorvanek in the targeted vehicle. Mathewson testified that he did not observe anyone *Page 6 
in the passenger side of the vehicle. Mathewson testified that the photos accurately depicted the scene on September 30, 2006.
 {¶ 16} Mathewson testified that he was involved in a controlled buy on October 3, 2006. He testified that his duties included performing surveillance and taking photos. He explained that the drug buy took place on a sailboat belonging to Skorvanek. The boat was docked at Marina International Boat Docks in Lorain County, Ohio. Mathewson testified that Skorvanek was present on the sailboat, along with a female and another male. Mathewson testified to photos that he had taken of the confidential informant walking to the sailboat. Mathewson testified that after the drug deal was completed, he observed the confidential informant until he was in the care of the case officer. According to Mathewson, this is "[t]o ensure their safety and to make sure they make no other stops with anyone else."
 {¶ 17} On cross examination, Mathewson testified that on September 30, 2006, he was approximately 150 yards from Skorvanek when he observed the drug deal. He further testified that the photos he had taken on September 30, 2006 were blurry and he could not identify the license plate on the vehicle. Mathewson further stated that although he could not positively identify Skorvanek from the photo alone, he testified that he had previously identified Skorvanek when he took the photo. He clarified that he observed Skorvanek in the vehicle on September 30, 2006. Mathewson further testified that he did not remember the name of the confidential informant that made the controlled buy on September 30, 2006. Mathewson verified that none of the photos from September 30 depict the confidential informant buying drugs. However, Mathewson explained that on September 30, 2006, he observed a drug deal take place.
 {¶ 18} Mathewson testified that on October 3, 2006, he was approximately 300 yards away from the drug transaction. He verified that none of the photos he took on October 3, 2006 *Page 7 
depicted Skorvanek. Mathewson stated that the photos did not depict everything that he observed, but that they were consistent with what he observed.
 {¶ 19} On redirect examination, Mathewson testified that he was not the only one taking photographs of the drug buys. Mathewson explained that on September 30, he "observed the target, Mr. Skorvanek, pull into the lot, wait briefly, meet with another party. They had a conversation, made an exchange. I was listening to the conversation while I was looking at this and taking picture[s]. Mr. Skorvanek left. I followed him for a short time, and that was all I did for that deal." He further explained that the transaction was a hand-to-hand transaction from one vehicle to the other. On recross examination, Mathewson testified that due to everything that was going on during surveillance, it was possible that he did not get a photo of the hand-to-hand drug transfer.
 {¶ 20} The State next called Sergeant Albert Rivera of the Lorain Police Department. Between September of 2006 and October of 2006, Rivera was the supervisor of the narcotics unit. He testified that on September 30, 2006, he was involved in a narcotics investigation of Skorvanek. Rivera testified that the confidential informant that police used during the September 30, 2006 investigation was named Mr. Burner. Rivera explained that the controlled buy began with cell phone conversations between Burner and Skorvanek. On September 30, 2006, the controlled buy was set to take place in the parking lot of Biggy's Bar. Rivera testified that on September 30, 2006, his primary role was to run the electronic monitoring and recording device ("KEL unit"). He explained that the KEL unit was a portable receiver that police could monitor in their vehicles. Burner wore a body wire and police could monitor and record what was being said during the drug transaction. *Page 8 
 {¶ 21} Rivera explained that prior to the controlled buy, officers met with Burner to give him "pre-buy precautions." He explained that pre-buy precautions included searching Burner, briefing him as to the goals of the investigation, and searching his vehicle. Officers then gave Burner photocopied buy money, "which is money that we supply the informant to use to buy the drugs from the suspect in the case[.]" Rivera testified that he searched Burner and his vehicle prior to the drug buy. Rivera explained that after Burner was searched and wired, he was kept under constant surveillance. Rivera testified to a surveillance photo that showed both Burner and Skorvanek's vehicles. Rivera stated that Skorvanek's vehicle was registered to his sister. Rivera explained that from his positioning, he could not see the transaction take place, but he could see the vehicles arrive and leave. He further stated that he could hear the drug buy through the KEL unit. He stated that although there was ambient noise, he could hear Burner clearly and Skorvanek's voice was "a little low[.]" Rivera testified that he was familiar with Skorvanek's voice because he had numerous investigations involving him.
 {¶ 22} After the drug buy, Rivera met with Burner at a prearranged location. Once Burner turned over the drugs he had purchased, officers searched him and his vehicle and removed his wire. Rivera testified to the evidence that he recovered from Burner. He explained that he field tested the suspected drugs and the test showed a positive presumptive test for heroin. Rivera testified that his search revealed that Burner did not have any buy money left on him. Rivera testified that some of that buy money was later recovered, although he did not specify where.
 {¶ 23} Rivera further testified as to the October 3, 2006 controlled buy. He explained that Burner was again the confidential informant. Rivera explained that the drug buy was set up by phone and that a detective dialed the phone number. He explained that the phone *Page 9 
conversations were recorded. He testified that officers sought to recover the phone during their investigation. Rivera testified that the phone tied to the prearranged phone calls was found on October 4, 2006, during the execution of the search warrant.
 {¶ 24} Rivera confirmed that he spoke with Burner and gave him the pre-buy precautions. He testified that prior to the controlled buy, detectives had learned that Skorvanek lived on the sailboat. Rivera testified that he took surveillance photos and that Burner was kept under surveillance until he reached Skorvanek. He again testified to a cell phone call made from Burner to a cell phone with phone number of 258-3229. He further testified that the voices on the phone call were Burner and Skorvanek, and that Skorvanek picked the meeting location. Rivera testified that Danny Frey was the former owner of the sailboat. Rivera testified to the KEL unit recording regarding the drug buy on the sailboat. He testified that Skorvanek's voice was on the tape. On the tape, Burner was speaking to a man named Johnny. Upon completion of the drug buy, Burner met with officers and surrendered folded up pieces of paper and foil that contained a substance that field tested positive for heroin.
 {¶ 25} Rivera testified that based upon the two controlled drug buys, officers sought and received a search warrant for the sailboat, which was executed on October 4, 2006. Upon arrival, the officers found Skorvanek sitting below the deck. Rivera testified that Skorvanek was sitting at a table grinding and weighing a substance that field tested positive for heroin. Officers also located the cell phone that Burner had called to arrange the drug buy. Further, Rivera testified, officers located drugs and money on Skorvanek. Rivera testified that he located foil bindles on Skorvanek, as well as all of the October 3, 2006 buy money. Rivera testified that a male and female were present with Skorvanek on the boat. On the male, officers located cotton swabs with residue on them. *Page 10 
 {¶ 26} Rivera further testified that a second search warrant was obtained and executed on October 5, 2006 at Skorvanek's two storage units. At one storage unit, Rivera located two gram scales, a mirror, and a plastic baggie containing balloons. Rivera testified that in his experience in law enforcement and from past criminal investigations, balloons are used as a container for heroin. Rivera further testified that officers located a "tally sheet[,]" i.e., "a record of money owed by someone for a specific reason. In this case I believe it to be money owed for drugs." He further testified to a 100 gram weight used to calibrate the digital gram scales.
 {¶ 27} On cross examination, Rivera testified that during the September 30, 2006 controlled buy, Burner and Skorvanek were the only people in the Biggy's Bar parking lot. He testified that the officers did not locate the buy money from September 30, 2006. Rivera testified that Burner had a misdemeanor traffic offense, but that he could not recall Burner's full criminal history. He explained that Burner agreed to be a confidential informant because "[h]e was trying to plea bargain an offense he was involved with, traffic offense. I think it was a DUS. I am not real sure." Rivera testified that if Burner cooperated with the investigating officers, the officers would request dismissal of his traffic violation.
 {¶ 28} On further redirect, Rivera testified that the amount of time that he had spent on other investigations of Skorvanek allowed him to recognize Skorvanek's voice on the taped conversations.
 {¶ 29} The State next called Jennifer Acurio, a forensic scientist in the drug chemistry area of the Ohio Bureau of Criminal Identification and Investigation ("BCI"). She testified that she tested the baggies of heroin obtained from the controlled buys and that they tested positive for heroin. She also tested the pills obtained from Skorvanek and testified that 9 of the pills were methadone, 28 pills contained oxycodone and a partial tablet contained buprenorphine. She *Page 11 
explained that along with the pills was some white powder that tested positive for heroin. She further testified that the pills were in a pill bottle with the name John Skorvanek on it. Acurio testified that she tested several spoons that all contained heroin residue. She further testified that she tested the piece of cotton taken from the other male on the boat and that it tested positive for heroin.
 {¶ 30} The State next called Tom Nimon, a detective with the narcotics bureau of the Lorain Police Department. Nimon testified that he was involved in the October 4, 2006 execution of the search warrant. He testified that he collected evidence and took the preliminary photographs. Nimon testified that he was the first officer to enter the sailboat, and upon entering he "witnessed Mr. Skorvanek sitting on the boat preparing heroin." When asked how he knew that Skorvanek was preparing heroin, Nimon responded, "[b]ecause there was a small coffee grinder right next to him. And for five or six seconds myself and the other detective that happened to get on the boat initially, we watched him. We wanted to see how many people were inside the boat before we actually made entry. And he was putting heroin into little tinfoil bags or little pieces of tinfoil."
 {¶ 31} Nimon further testified that he collected syringes, a coffee grinder, a cell phone, three spoons, and packages of heroin all from the table upon which Skorvanek was preparing the heroin. Nimon testified that the cell phone was located directly in front of Skorvanek. The phone number of this cell phone corresponded with the cell phone number Burner called to arrange the drug buys with Skorvanek.
 {¶ 32} On cross examination, Nimon confirmed that the sailboat was actually registered to David Frey. However, Nimon explained, officers knew throughout the investigation that *Page 12 
Skorvanek was residing on the boat. Nimon stated that the other male found on the boat informed him "that he was there to purchase heroin from Mr. Skorvanek."
 {¶ 33} The State next called Georgeann Cockrell, a narcotics detective with the Lorain County Police Department. She testified that she was involved with the narcotics investigation of Skorvanek during September and October of 2006. On October 4, 2006, Cockrell was involved in the execution of the search warrant.
 {¶ 34} She testified that after the search warrant, she visited Skorvanek in jail. She testified that she went to serve him with the forfeiture and seizure notices for the sailboat and the inventory from the two storage units. Cockrell testified that she tape recorded the conversation she had with Skorvanek while he was in jail. During the interview, Skorvanek informed Cockrell that he used heroin to ease his back pains.
 {¶ 35} Cockrell verified that she was present when Burner made the two calls to Skorvanek's cell phone to arrange the drug buys. She testified that it was Skorvanek's voice on the phone calls. She further confirmed that she heard Skorvanek's voice on the recorded drug buy on the sailboat.
 {¶ 36} On cross-examination, defense counsel played Cockrell's entire recording from when she served Skorvanek with the forfeiture papers. She testified that upon executing the search warrant on the storage units, she reviewed the rental contracts and confirmed that Skorvanek was renting the storage units. She stated that she did not attempt to uncover any fingerprints from any of the items recovered from the storage units.
 {¶ 37} On re-cross examination, Cockrell verified that Skorvanek admitted that the items found in the toolbox during the search of the storage units were his. Upon the completion of Cockrell's testimony, the State rested its case. *Page 13 
 {¶ 38} Skorvanek testified on his own behalf. He stated the photos of his car behind Biggy's parking lot on September 30, 2006 did not show him trafficking drugs. He further stated that he was not in any of the surveillance photos of the October 3, 2006 incident. He testified that he is an admitted heroin user, that he has previously purchased heroin and that he knew what a heroin deal looked like. Skorvanek testified that the State's surveillance photos did not depict a heroin deal. Skorvanek admitted that it was his voice on the taped phone calls with Burner. He explained that he did not own the boat involved in this case, but that he "[a]lways partied there."
 {¶ 39} Skorvanek testified that a lot of people had access to his storage units. He testified that all the items that the police seized from his storage units were not his. Skorvanek testified that when Cockrell spoke to him while he was in prison he was not given his Miranda warnings, and he was not informed that he was being recorded. He stated that had he known he was being recorded and that Cockrell would ask questions about the crimes, he would not have talked to her.
 {¶ 40} When asked about how the buy money was found on him, Skorvanek admitted the money was found on him, but explained that he received the money from George Duff, who actually sold the heroin to Burner. Skorvanek testified that he and Duff had similar voices. When asked to explain why Duff gave him $100 in $20 bills, Skorvanek stated that Duff gave him the money because Duff owed it to Skorvanek's fiancé and Skorvanek was collecting for her. He testified that he did not receive the buy money from a drug deal.
 {¶ 41} Skorvanek next denied that he was preparing heroin when Nimon came on the boat to execute the search warrant. He testified that he was lying down, and that there was actually nothing on the table at the time the police arrived. "The picture I have seen with all the *Page 14 
needles and all that, that's staged." He admitted that he was under the influence of heroin when the officers executed the search warrant on the boat.
 {¶ 42} Skorvanek testified that he received social security checks due to a degenerative disease of his spine and that he was able to support himself on this income, along with some inheritance money and investments. He further testified that he gives legal and financial advice to earn money. He denied, however, that he was practicing law without a license.
 {¶ 43} On cross examination, he stated that he was not sure whose name was on the storage space contracts. He further stated that his memory was "[h]orrible at times." Skorvanek admitted that he knew that Cockrell was an officer when he spoke to her in jail, but that because she was not in uniform he did not know she was on duty. When asked about the large amount of money found on him upon execution of the search warrant, Skorvanek testified that "[e]very day of my life I have a thousand dollars in my pocket." Skorvanek testified that he sometimes kept property in other peoples' names, even though it was his property, for insurance purposes. He admitted that it was possible that he actually owned the sailboat despite the fact that it was in someone else's name.
 {¶ 44} Skorvanek testified that he was not using the heroin that police found on the boat during the execution of the search warrant because it belonged to Danny Frey, whose name was on the sailboat title. According to Skorvanek, because the heroin was on the boat and it did not belong to any of the individuals on the boat, it belonged to Frey.
 {¶ 45} With regard to the September 30, 2006 drug buy, Skorvanek testified that he went there to meet with someone named Philadelphia Pete who would sell him heroin. Skorvanek denied selling Burner heroin on September 30, 2006. He explained that he told Burner to go to *Page 15 
Biggy's parking lot because he hoped he and Burner could put their money together to buy more heroin from Philadelphia Pete.
 {¶ 46} Skorvanek testified that he had five prior felony convictions. He further testified that he had sold drugs in the past. Skorvanek testified that he has used the cell phone at issue in this case and that he answered the cell phone when Burner called to arranged the drug buy. He testified that he was concerned that Burner was "snitching," and therefore he "wasn't going to deal with him, wasn't going to do anything with him."
 {¶ 47} With regard to the buy money, Skorvanek admitted that he took the money from Duff after he observed Duff sell heroin to Burner. He further admitted that he had used heroin shortly before the police arrived on October 4. Skorvanek stated that he was truthful on the taped conversation with Cockrell and that he had stated that he gave the other man on the boat at the time of the search cotton balls with heroin residue on them.
 {¶ 48} On redirect examination, Skorvanek stated that it was in his nature to carry over a thousand dollars at all times. Skorvanek testified that he had a prescription for oxycodone. Skorvanek further denied preparing heroin on October 4, 2006, when the officers executed the search warrant.
 {¶ 49} It is clear from the testimony that the jury did not lose its way when it found Skorvanek guilty of trafficking in heroin, possession of heroin, possession of criminal tools, and possession of drug paraphernalia. Acurio testified that the substance at issue in this case tested positive for heroin. She further testified that several of the items seized on the boat and from the storage units tested positive for heroin. Further, several Lorain Police Department detectives testified that they witnessed Skorvanek sell heroin to Burner. The detectives also testified to, *Page 16 
and the jury heard, cell phone calls made by Burner to Skorvanek to set up a meeting place for the drug buys.
 {¶ 50} Nimon testified that on October 4, 2006, he observed Skorvanek preparing heroin. Specifically, Nimon testified that he watched as Skorvanek "was putting heroin into little tinfoil bags or little pieces of tinfoil." Rivera testified that he observed Skorvanek grinding and weighing heroin. When Rivera searched Skorvanek he discovered foil packets and the buy money Burner used to purchase the heroin from Skorvanek. Officers also testified that the cell phone used to arrange the drug buy location was on the table directly in front of Skorvanek.
 {¶ 51} While Skorvanek denied that he was trafficking drugs during his testimony, he also testified that he was an admitted heroin addict and that he had had at least five previous felony convictions. It is clear that the jury did not lose its way when it convicted Skorvanek of trafficking, possession of heroin, possession of criminal tools, and possession of drug paraphernalia. Accordingly, Skorvanek's first and second assignments of error are overruled.
 ASSIGNMENT OF ERROR III "THE TRIAL COURT ERRED IN DENYING [SKORVANEK'S] MOTION TO SUPPRESS THE INTERVIEW OF SKORVANEK AFTER HE WAS ALREADY IN CUSTODY."
 {¶ 52} In his second assignment of error, Skorvanek contends that the trial court erred in denying his motion to suppress the interview of Skorvanek after he was in custody. We do not agree.
 {¶ 53} While we note that Cockrell's behavior using recording equipment without advising Skorvanek of his Miranda rights is suspect, we find that he has waived any error with regard to his motion to suppress by failing to timely file the motion. *Page 17 
 {¶ 54} A motion to suppress is governed by Crim. R. 12(C)(3). This Rule provides that a motion to suppress evidence must be raised prior to trial. Crim. R. 12(D) states, in relevant part, that "[a]ll pretrial motions * * * shall be made within thirty-five days after arraignment or seven days before trial, whichever is earlier. The court in the interest of justice may extend the time for making pretrial motions."
 {¶ 55} A defendant's failure to timely file a motion to suppress results in a waiver of that issue, "but the court for good cause shown may grant relief from the waiver." Crim. R. 12(H). The decision as to whether to permit leave to file an untimely motion to suppress is within the sound discretion of the trial court. Akron v. Milewski (1985),21 Ohio App.3d 140, 142.
 "An abuse of discretion involves far more than a difference in * * * opinion * * *. The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an `abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." State v. Jenkins (1984), 15 Ohio St.3d 164, 222, quoting Spaulding v. Spaulding (1959), 355 Mich. 382, 384-5.
 {¶ 56} According to Crim. R. 12, Skorvanek's motion to suppress was due on January 2, 2007 (35 days after his November 29, 2006 arraignment).[1] He did not file the motion until June 26, 2007. Skorvanek argued at trial that this motion should have been granted because he was not read his Miranda rights. We further note that Skorvanek did not attempt to show good cause as to why he filed his motion over 175 days late. Finally, even if we were to find that the trial court should have granted the motion to suppress, in light of our resolution of the first *Page 18 
assignment of error regarding the immense amount of evidence against Skorvanek, we would find any error harmless. See Crim. R. 52(A).
 {¶ 57} Skorvanek's third assignment of error is overruled.
 ASSIGNMENT OF ERROR IV "[SKORVANEK] WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES AND UNDER ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION."
 {¶ 58} In his fourth assignment of error, Skorvanek contends that he was denied the effective assistance of counsel, in violation of his rights under the Sixth Amendment of the United States Constitution, and under Article 1, Section 10 of the Ohio Constitution. We do not agree.
 {¶ 59} In evaluating an ineffective assistance of counsel claim, this Court employs a two-step process as described in Strickland v.Washington (1984), 466 U.S. 668, 687. First, the court must determine whether there was a "substantial violation of any of defense counsel's essential duties to his client." State v. Bradley (1989),42 Ohio St.3d 136, 141, quoting State v. Lytle (1976), 48 Ohio St.2d 391, 396-97, vacated in part on other grounds, 438 U.S. 910. Second, the court must determine if prejudice resulted to the defendant from counsel's ineffectiveness. Bradley, 42 Ohio St.3d at 141-142, citingLytle, 48 Ohio St.2d at 396-397. Prejudice exists where there is a reasonable probability that the trial result would have been different but for the alleged deficiencies of counsel. Bradley, 42 Ohio St.3d at paragraph three of the syllabus. Defendant bears the burden of proof, and must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." State v.Colon, 9th Dist. No. 20949, 2002-Ohio-3985, at ¶ 48, quotingStrickland, 446 U.S. at 687. "An appellate court may analyze the prejudice prong of the Strickland test alone if such analysis will dispose of a claim of *Page 19 
ineffective assistance of counsel on the ground that the defendant did not suffer sufficient prejudice." State v. Kordeleski, 9th Dist. No. 02CA008046, 2003-Ohio-641, at ¶ 37, citing State v. Loza (1994),71 Ohio St.3d 61, 83.
 {¶ 60} Skorvanek argues that he was prejudiced due to his counsel's failure to file a motion to suppress his statements to Cockrell while he was in jail. In an effort to show that he was prejudiced by this failure, Skorvanek points this Court to his argument that his convictions were against the manifest weight of the evidence and were not based on sufficient evidence. In our disposition of these assignments of error, we found ample evidence upon which the jury could have found Skorvanek guilty of the charged crimes. We note that even if we were to ignore any reference to the taped conversation between Cockrell and Skorvanek, we would find that the State presented sufficient evidence to convict Skorvanek and the jury verdict was not against the manifest weight of the evidence. Accordingly, we find that Skorvanek has failed to show that any error his trial counsel may have made in failing to file a timely motion to suppress changed the outcome of his case. Accordingly, Skorvanek's fourth assignment of error is overruled.
 III. {¶ 61} Skorvanek's assignments of error are overruled and the judgment of the Lorain County Court of Common Pleas is affirmed.
Judgment affirmed.
 The Court finds that there were reasonable grounds for this appeal. *Page 20 
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
CARR, P. J., WHITMORE, J. CONCUR
[1] Although Crim. R. 12(D) also provides for the filing of the Motion to Suppress seven days prior to trial, which would have been by June 19, 2007, it is only the earlier of either this date or 35 days after arraignment that is applicable. January 2, 2007 is earlier than June 19, 2007, thus the filing deadline was January 2, 2007. *Page 1